John WARD, Plaintiff-Respondent,

v.

**CITY NATIONAL BANK & TRUST COMPANY OF KANSAS CITY, Defendant and Third-Party Plaintiff-Appellant,**

v.

**MOLINE–MONTGOMERY ELEVATOR COMPANY, Third-Party Defendant-Appellant,**

and

Floyd O. Calvert, Henry J. Schneck, Albert L. Darling, and Gordon A. Sparks, Trustees of Murphy Elevator and Service Company, Third-Party Defendants-Appellants.

No. 50003.

Supreme Court of Missouri,

Division No. 2.

April 13, 1964.

Motion for Rehearing or to Transfer to Court En Banc Denied June 8, 1964.

Robert A. Meyers, Kansas City, George V. Aylward, Jr., Kansas City, for plaintiff-respondent.

Paul E. Vardeman, Robert H. Kendrick, Kansas City, Johnson, Lucas, Bush & Vardeman, Kansas City, of counsel, for appellants, Floyd O. Calvert, Henry J. Schneck, Albert L. Darling and Gordon A. Sparks, trustees of Murphy Elevator & Service Co.

Don M. Jackson, Kansas City, Jackson & Wade, Kansas City, of counsel, for appellant, Moline-Montgomery Elevator Co.

Thomas A. Sweeny, Kansas City, Popham, Thompson, Popham, Trusty & Conway, Kansas City, of counsel, for appellant City Nat. Bank & Trust Co., trustee.

HENRY J. WESTHUES, Special Commissioner.

John Ward, plaintiff-respondent, filed this suit, an action for damages, in the Circuit Court of Jackson County, Missouri, against the City National Bank & Trust Company of Kansas City for personal injuries sustained when a self-service elevator in which Ward was a passenger fell about two floors to the bottom of the elevator shaft.

The Bank filed an answer and also a third party petition naming the Moline-Montgomery Elevator Company and Floyd O. Calvert, Henry J. Schneck, Albert L. Darling, and Gordon A. Sparks, Trustees of the now defunct Murphy Elevator and Service Company, as third-party defendants.

In the course of the opinion, we shall refer to plaintiff-respondent as Ward; to the defendant and third-party plaintiff-appellant as the Bank; and to the third-party defendants-appellants as Moline and Murphy.

A trial resulted in a verdict for Ward against the defendant Bank in the sum of $20,000. The jury further found in favor of the Bank against Moline and Murphy for $20,000. The Bank appealed from the refusal of the trial court to assess attorneys' fees in the sum of $2,250 against the third-party defendants. Moline and Murphy appealed from the judgment in favor of the Bank.

At this stage, we deem it best to state briefly the facts and the theory of the parties during the trial of this case. On March 10, 1958, Ward, intending to go to the third floor of the Bank building on a matter of business, found the elevator at the first floor, pressed the "UP" button, and the elevator door opened. Ward entered the elevator and when it was nearing the third floor, it suddenly began to descend rapidly and fell to the bottom of the shaft. Ward sustained serious injuries. In his case against the Bank, he relied on the res ipsa loquitur doctrine.

It is admitted that Ward was entitled to submit his case to a jury on that theory.

The Bank charged specific negligence against Moline. It claimed that on March 10, 1958, the day Ward was injured, the elevator could not be operated due to some defect; that Moline was notified and, in response to that call, a service man was sent to make the necessary repairs; that this service man was negligent in permitting the elevator to be used before it had been made safe. The Bank charged that Murphy had negligently installed the elevator in that a neoprene or rubber hose about 15 to 20 inches in length had been used in the supply line next to the piston; that this hose had broken; that this permitted the oil to escape, causing the elevator to drop.

It may be stated here that the elevator in question was an electrohydraulic self-operated elevator. It was equipped with an oil supply tank holding about 150 gallons of oil. When the button marked "UP" was pressed, an electric pump would be put into operation, pumping oil from the tank through a pipe to a piston, and the elevator would thereby be pushed upward. When the "DOWN" button was pressed, the mechanism would be put into motion, permitting the oil to return to the tank and the elevator to descend. Moline and Murphy each denied being guilty of any negligence.

Moline and Murphy each filed separate briefs. Each claimed that the evidence was insufficient to sustain a finding of negligence and therefore the trial court erred in submitting the case to a jury against them. Each claimed that the trial court erred in refusing their requests to impanel twenty-one veniremen and to permit them jointly to strike three names from the jury list. Moline and Murphy claimed that they as third-party defendants were not parties to the action between Ward and the Bank; that the Bank's action is one of indemnity against Moline and Murphy and therefore they were entitled to

three separate peremptory challenges under Section 494.200, V.A.M.S. We shall dispose of this contention before considering other points briefed. We cannot agree with the contention concerning the jury challenges for the reason that the statute governs this question and it does not authorize more than three challenges to plaintiffs or defendants. The statute, Sec. 494.-200, supra, reads as follows: "In trials of civil causes each party shall be entitled to challenge, peremptorily, three jurors; but when there are several *plaintiffs* and *defendants they shall join* in their challenges, and the plaintiff shall, in all cases, announce his challenges first." (Emphasis supplied.) In 50 C.J.S. Juries § 280b, p. 1069 it is stated, "At common law there is no right of peremptory challenge in civil actions. The right is, therefore, purely statutory and does not exist except where it is expressly so conferred, * * *."

Moline and Murphy, in their briefs, cited the case of Sutton v. Otis Elevator Co. et al., 68 Utah 85, 249 P. 437, as authority in support of their contentions. It is important to note that the Utah statute is not worded as our statute. See 249 P. l. c. 454, supra, where, in the course of the majority opinion in the Sutton case, the applicable Utah statutes are quoted. The Utah statute does *not* say that where there are several *plaintiffs* or *defendants* they must join in their challenges. It says that *each party* is entitled to challenge. Our Missouri courts have held that where there are several plaintiffs or defendants they must join even though their interests may be adverse to each other. White v. Teague, 353 Mo. 347, 182 S.W.2d 288, l. c. 291(4, 5); Clark v. St. Louis .& S. Ry. Co., 234 Mo. 396, 137 S.W. 583, l. c. 588 (2); Adair v. N. W. Electric Power Cooperative, Inc., Mo.App., 329 S.W.2d 33, l. c. 36(3, 4); Kidd v. Chicago, R. I. & P. Ry. Co., 310 Mo. 1, 274 S.W. 1079, l. c. 1093, 1094(25) (26, 27).

There is no uniform rule or practice governing the number of challenges where there are several parties plaintiffs or defendants. See 50 C.J.S. Juries § 281a (3), p. 1073, and cases there cited. It is the court's duty to follow the statutory provisions. The trial court complied with the statute and did not err in refusing additional peremptory challenges.

We shall now dispose of the contention that the evidence was insufficient to sustain a verdict against Moline. Murphy installed the elevator during the months of December, 1955, and January, 1956. Murphy had a contract to service and inspect the elevator regularly. The last inspection had been made eleven days prior to the day Ward was injured. The elevator had also been inspected regularly by a city inspector. On March 10, 1958, the elevator went "out of commission." Through a mistake, Moline was notified and requested to send someone to remedy the situation. Not knowing that Murphy had a service contract, Moline sent a service man named Greer to do the work. Greer spent some time in finding the cause of the trouble. After several hours, he found a screw loose on the "UP" control which he replaced and the elevator was put back in operation. Greer and a helper ran the elevator up and down a number of times and it worked properly. While Greer was working to find the trouble, a 10-ampere fuse burned out. It was in evidence that for safety purposes a 10-ampere fuse was usually installed on each side of the shaft. If either burned out, the elevator would not operate. Greer did not have a 10-ampere fuse with him, so he used a 30-ampere fuse while he tested the elevator. After the elevator was tested and functioned properly, Greer left the elevator at the first floor and went to his truck to get a 10-ampere fuse to replace the 30-ampere fuse which he had used in the shaft. It was while he was away that Ward attempted to go to the third floor by way of the elevator and was injured.

It was discovered that a hose about 15 to 20 inches in length had been installed next to the piston as a part of the supply

line. This hose had ruptured at one of the ends where it had been attached. A great quantity of oil had escaped and was found in the elevator pit. There was substantial evidence to the effect that the installation of a 15 to 20-inch hose next to the piston was not a proper installation and was considered unsafe.

■ The Bank, by an instruction given at its request, submitted its case to the jury as against Moline on the theory that Greer was negligent in failing to notify the Bank before placing the elevator in operation that the presence of the hose rendered the elevator unsafe. We are of the opinion that the evidence was insufficient to sustain a finding that Greer was guilty of any negligence. It was in evidence that there was some oil in the pit which Greer noticed before he began his search for the trouble which caused the elevator to be out of order. The evidence was that the movements of the piston up and down caused some oil to escape; that such leakage was normal. A circular pan surrounded the piston with a spout attached through which the oil flowed from the pan into a bucket which would be emptied when filled. There was evidence that the bucket had been misplaced which caused the leakage to drip into the pit. There was no evidence that there was any visible defect in the hose. The only duty imposed on Greer was to repair the defect which caused the elevator to be out of service. It was not his duty to inspect the elevator for the purpose of determining whether the installation was improper. The city, through its agents, had approved the installation as made by Murphy. In the circumstances, it would have seemed odd and out of place for Greer to have found fault with the installation. Greer performed the duty for which he was called and there was no evidence that anything he did was not well done. The Bank cited the cases of Hudson v. Moonier, 8 Cir., 102 F.2d 96; Brunke v. Missouri & K. Telephone Co., 115 Mo. App. 36, 90 S.W. 753; Caldwell v. Payne, Mo., 246 S.W. 312, and other cases in support of the contention that Greer was negligent. To illustrate the rule that is recognized in those cases, we quote from the Hudson case, supra, where the federal court said, at page 99 of 102 F.2d: "In the third place, a still broader ground of liability than the two stated above is found in the Missouri law. It is: That in all cases in which any person undertakes the performance of an act which, *if not done with care and skill,* will be highly dangerous to the persons or the lives of one or more persons, known or unknown, the law, ipso facto, imposes as a public duty the obligation to exercise care and skill." (Emphasis supplied.) It is apparent that, measured by that rule, the evidence was insufficient to sustain a finding of negligence on the part of Greer. We rule that the trial court should have directed a verdict in favor of Moline.

■ We are of the opinion that the evidence was ample to sustain a finding that Murphy was negligent in installing the short hose next to the piston. There was some dispute whether the hose was made of neoprene or rubber. However, under the evidence that was immaterial. Murphy purchased the elevator and its parts from the Murphy Elevator Company of Louisville, Kentucky. (There was no connection between the two corporations except that the third-party defendant was a customer of the Louisville firm.) A Mr. Carlisle, vice president of the Kentucky company, testified (through deposition) that the short hose in question was not included in the equipment shipped to Murphy; that a hose about 6 feet in length was sent. The evidence disclosed that this longer hose had been installed in the supply line, some distance from the piston. The purpose of a hose in the supply line was to absorb the pulsation caused by the electric pump while the elevator was pushed upward. The evidence was that the shorter hose was not necessary. Mr. Carlisle testified that full instructions as to installation of the elevator accompanied the shipment and that a hose

next to the piston was not called for. There was no explanation made as to the reason the shorter hose was used except some evidence that it was used to accomplish a fitting or connection of the supply line to the piston; that is, it was necessary to make a slight loop or bend and since the metallic pipe could not be bent, a hose was used. It was in evidence that when the supply line was replaced with all metallic pipe after the hose broke, it was necessary to cut a hole at a different place in a wall to make a straight line. A number of witnesses schooled in the construction or installation of elevators testified that it was not customary to install a hose next to the piston. Some witnesses of many years' experience had never seen such an installation. There was evidence that those installing hydraulic elevators followed the American Standard Safety Code for Elevators. A new code was published in the fall of 1955. This code disapproved the use of a hose such as the one here in question. This code was published after the installatoin of the elevator in question was begun. However, it was published and Murphy had notice of it before the installation of the elevator was completed. The City of Kansas City did not adopt the new code until January 23, 1956. The elevator had then been completed but had not been turned over to the owner.

■ Murphy claims, in the brief, that the American Standard Safety Code for Elevators should not have been used as evidence or in the examination of witnesses. To this we cannot agree. Such standards are promulgated by experts in that line of business. Witnesses testified that many concerns followed that code. The fact that the new code was published while the elevator was under construction and was adopted by Kansas City before the elevator was turned over to the owner was a fact which a jury could properly consider on the question of negligence. Reed v. Missouri-Kansas-Texas R. Co., (Court en Banc), 362 Mo. 1, 239 S.W.

2d 328, l. c. 330(2), and authorities there cited. Murphy says that the evidence of Carlisle should not have been admitted. Much of Carlisle's evidence was cumulative of evidence given by witnesses of Murphy and Moline. Certainly the evidence of the equipment shipped to Murphy was competent. Carlisle had had years of experience in the field of elevators and was a competent witness. In fact, Murphy relies upon the evidence of this witness to support an instruction which was offered but refused. Under that point concerning the ruling on the instruction, Murphy treats Carlisle, and we say properly so, as an expert.

■ This brings us to the point wherein Murphy says that the court erred in refusing to give instruction No. 18. This instruction was based on the theory that if the hose broke "because of a latent defect in the hose unknown to and not readily apparent to the employees of Murphy" a verdict against Murphy would not be justified. The Bank urges that the evidence was not sufficient to justify such an instruction. Murphy relies to some extent on the evidence of Carlisle to support the instruction. We need not rule the question because the Bank also says the instruction is improper because it uses the phrase "not readily apparent." It is contended that the instruction should have said in substance that the defect could not have been discovered by the exercise of ordinary care. We rule that the point has merit and the trial court was justified in refusing the instruction. The instruction could well have been interpreted by a jury to mean that if the defect could not have been *easily* discovered a verdict for Murphy was justified. That is not the rule. For a comprehensive discussion on this point, see the opinion in the case of Shroder v. Barron-Dady Motor Co., Mo., 111 S.W.2d 66, l. c. 70, 71(3, 4) (5). It must be noted that in the case before us Murphy installed the elevator and that Murphy had the duty to exercise the degree of care commensurate with the like-

lihood of persons being injured by reason of defects in the equipment or faulty construction. The offered instruction did not meet the required standard of care.

■ Finally, Murphy claims that the verdict of $20,000 is excessive. We approach this subject with the rule in mind that an appellate court in Missouri will not and is not authorized to disturb a verdict of a jury unless it is grossly excessive. It would serve no useful purpose to review this question. Those interested may find the subject treated in 5A C.J.S. Appeal & Error §§ 1650, 1651, pp. 367–402, where numerous cases, including many from the courts of this state, are cited. Dr. Robert A. Moore, whose chief work was taking care of industrial cases and traumatic surgery, treated Ward for his injuries. He testified that he examined Ward on March 10, 1958; that Ward complained of pain in his left foot and ankle as well as pain in the right ankle and soreness in his back. X rays were taken and on March 11 fractures of the second and third metatarsal bones and the fibula, "or outer ankle bone," of the left leg were treated. A cast was applied which extended from the "end of the toes up to the groin." The fibula had not separated but the metatarsal bones had. These were set by manipulation "under fluoroscopic observation." Later, however, it was discovered that the metatarsal bones had redisplaced themselves. Then, the bones were realigned by an open reduction. Intramedullary pins were inserted to hold them in place. A second cast was applied and Ward remained in a hospital until April 3, 1958. The cast was removed on May 12. Ward used crutches for some time and was given whirlpool hydrotherapy. The bones of the foot healed fairly well. However, a flattening of the left foot will be permanent. A swelling on the top of the metatarsal bones developed which, according to medical evidence, must in all probability be remedied by an operation.

Ward, when injured, was 43 years of age and was employed by I.B.M. corporation as a customer engineer. He was a healthy, physically strong man before the fall of the elevator. He was fond of and had done a great deal of hiking as well as having engaged in various athletic pursuits. His duties required a great amount of walking. The evidence was that the athletic activities had not been engaged in since the date of his injuries and that walking had been painful. According to the evidence, these handicaps will be permanent. There was evidence of other injuries, not so serious, which we need not mention. Ward experienced the usual pain and suffering incident to injuries such as he had. The actual material loss in wages together with doctor and hospital bills amounted to about $3400, exclusive of any future expense for treatments or operations.

■ The verdict of $20,000 was a liberal award when viewed in the light of a number of previous cases. However, courts would be blind, indeed, if judicial notice were not taken of the continued and gradual reduction of the value of the dollar. In view of all of the circumstances, we cannot say that the verdict is such that we are justified in ordering a remittitur.

We shall now dispose of the appeal of the third-party plaintiff, the Bank, concerning its claim for attorneys' fees against the third-party defendants. This claim must be based on an implied contract. There was no express contract of indemnity. Murphy denies liability for attorneys' fees on the theory that the Bank was guilty of laches in notifying Murphy of the Bank's claim and an opportunity to defend Ward's action for damages.

■ The Bank and Murphy each cited in their briefs 42 C.J.S. Indemnity § 13, p. 583. The law there considered applies to express contracts of indemnity and not implied obligations. The law as to im-

plied contracts is found in 42 C.J.S. Indemnity § 24, p. 602, where we find the following concerning costs and attorney's fees in cases such as the case before us: "Where a person is obliged to defend against the act of another, against whom he has a remedy over, he may, if such other has notice of the suit and an opportunity to defend, hold him liable not only for the amount of damages * * * but also for all reasonable and necessary costs and expenses incurred in such defense, including attorney's fees."

In this case, Ward was injured on March 10, 1958, as noted above. He filed suit against the Bank on February 10, 1959. The Bank, on April 28, 1959, filed a general denial. On November 6, 1961, the Bank filed its third-party petition against Moline and Murphy. The Bank admitted it gave no notice nor did it request Moline and Murphy to defend Ward's suit. In fact, no such demand or request was ever made. The first notice Moline and Murphy had of a charge of negligence against them was the third-party petition which was more than thirty months after the Bank had filed a general denial to Ward's petition for damages. It is our opinion that the trial court was justified in refusing to allow the Bank to recover attorneys' fees.

We have examined all questions presented for review and our ruling is that the judgment against the Bank in favor of Ward should be affirmed. The judgment in favor of the Bank and against Moline should be reversed. The judgment in favor of the Bank against Murphy should be affirmed. It is so ordered.

PER CURIAM:

The foregoing opinion by WESTHUES, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.