**SAFEWAY STORES, INC., Plaintiff,**

v.

**L. D. SCHREIBER CHEESE COMPANY, Inc., Defendant and Third-Party Plaintiff,**

v.

**STANDARD MILK COMPANY, Inc., Third-Party Defendant.**

No. 2078.

United States District Court, W. D. Missouri, Southwestern Division.

April 23, 1971.

Lloyd Buehner, Buehner & Thomas, Joplin, Mo., for third party defendant and plaintiff.

Harold Fisher, Allen, Woolsey & Fisher, Springfield, Mo., for third party defendant.

Gene C. Morris, Rogers, Field, Gentry, Benjamin & Robertson, Kansas City, Mo., for plaintiff.

## MEMORANDUM AND OPINION: FINDINGS OF FACT AND CONCLUSIONS OF LAW

ELMO B. HUNTER, District Judge.

This is a diversity action originally brought by plaintiff Safeway Stores, Inc., (Safeway) against defendant L. D. Schreiber Cheese Company (Schreiber), a wholesaler and distributor of cheese, to recover damages incurred as the result of certain consumer claims against Safeway arising from the retail sale of certain defective cheese sold to Safeway by Schreiber. Shortly after this action was initiated, Schreiber filed its third-party complaint against Standard Milk Company (Standard), manufacturer of the cheese, seeking (1) indemnification for the Safeway claims, (2) recovery of attorney's fees and costs expended in the defense of this action by Safeway, and (3) recovery of certain costs expended for the testing of cheese. On July 8, 1970, judgment was entered in favor of Safeway and against Schreiber in the sum of $68,639.50.[1] The next day, upon the request of Safeway, the remaining counts of its complaint were dismissed with prejudice. The documents filed on August 7, 1970, by defendant Schreiber reveal that the judgment against it has been satisfied. Thus, there remain for resolution in this cause only the claims of defendant Schreiber against third-party defendant Standard.[1a]

For several years prior to the occurrences involved herein, Schreiber purchased the entire output of cheese produced by Standard which, in turn, was sold by Schreiber to Safeway, its single largest customer, for resale to the consumer. The cheese, packaged in 40-pound blocks which were wrapped in various materials[2] and incased in fiber boxes, was delivered from Standard to Schreiber by truck at the dock of Refrigerated Services, Inc., a public warehouse at Carthage, Missouri. At the dock, samples from one or two cheese blocks of the same "vat"[3] were taken by Schreiber personnel so that certain tests could be made in order to determine whether the product met the requirements of Safeway. The cheese was tested for extraneous matter, moisture content, hydrogen ion concentration, and fat content. The cheese was not normally tested at this stage for the presence of bacteria. After the samples were taken from the incoming cheese for use in this testing, the cheese was immediately placed in storage with Refrigerated Services, Inc., in the name of Safeway. Cheese from Standard was also stored at the Railway Ice & Service Company at Aurora, Missouri, and the Marionville Ice & Refrigeration Company at Marionville, Missouri. The only difference in procedure at these two other locations was that the cheese would be placed directly into storage and would be tested by a Schreiber employee later on the same day or in the next few days.

At all three of the storage locations, once the cheese was stored, it was considered to be the property of Safeway. Later, upon the request of Safeway, Schreiber would have the cheese withdrawn from storage. It then would be regraded and delivered to Safeway's own packaging plant in Carthage, Missouri. There, some of the cheese was wrapped for sale in Safeway stores and some of the cheese was sent out in bulk or block form to other distribution points.

1. With regard to the jurisdiction of this Court as to the third-party claim of Schreiber, see: 3 Moore, Federal Practice, ¶¶ 14.25, 14.26 (1968 ed.).

1a. All facts recited in this opinion are either uncontroverted or found by the Court to be established by the evidence.

2. Although various materials are used for wrapping the cheese, the evidence adduced at trial established that the cheese was hermetically sealed at the factory.

3. A "vat" consists of approximately 2,000 pounds of cheese. In the manufacture of cheese, 20,000 pounds of milk is placed into a cheese vat. That amount of milk makes approximately 2,000 pounds of cheese. The 2,000 pounds is, in turn, packaged into 40-pound blocks. Thus, there are approximately 50 identical blocks of cheese in every "vat."

In late September of 1965, Safeway began to receive complaints from its consumers on the West Coast who had purchased cheese from its stores and later had become ill. Samples of the cheese retrieved indicated that it was the product of Standard which had been sold to Schreiber and resold to Safeway.

As a result of the volume of complaints by consumers on the West Coast and upon the demand of various governmental agencies, including the Federal Food and Drug Administration, all cheese manufactured by Standard was removed from the shelves of Safeway stores and was taken from West Coast storage locations. That cheese was either destroyed or buried under the supervision of the Federal Food and Drug Administration, or was returned to Schreiber. Demand for reimbursement for this cheese was made on Schreiber by Safeway by invoice in the amount of $55,558.84, representing 82,719 pounds of cheese. In due time this invoice was paid by Schreiber. Schreiber, in turn, billed Standard in the same amount. In January of 1966, Safeway returned all of its inventory of Standard cheese, approximately three million pounds, which was in storage in the Carthage, Missouri, area. Both parties agree that Standard has satisfied any claims Schreiber may have regarding reimbursement for the cheese product itself.[4]

On January 12, 1966, Schreiber and Standard were made defendants in a civil action [5] brought in this Court by the United States of America. Pursuant to that action, and on the same day, this Court entered a temporary restraining order which prohibited the selling or moving of the above-mentioned cheese in interstate commerce until tests could be performed to establish whether it contained "coagulase positive Staphylococci aureus" capable of producing enterotoxin.[6] On February 15, 1966, all of the defendants in that action joined in a consent decree of permanent injunction which again prohibited the selling or moving of the cheese in interstate commerce until it could be tested to determine whether it was safe for human consumption.

At the time of the Government action, Schreiber had in its possession approximately four million pounds of cheese which had been manufactured by Standard. All of this cheese was required to be properly tested to assure that it did not contain Staphylococci capable of producing enterotoxin or the enterotoxin itself. However, at the time of the injunction, there were no tests generally recognized in the cheese industry to discover the actual existence of enterotoxin.[7]

Schreiber therefore undertook to contact scientists who had been doing re-

4. As will later be discussed, there remain Schreiber's claims for (1) any testing expenditures which may fall within the coverage of Standard's comprehensive insurance, (2) for indemnification of the sums paid by Schreiber to Safeway as the result of consumer claims, and (3) for attorneys' fees and costs expended by Schreiber during the defense of the Safeway claim.

5. United States v. Standard Milk Company, et al., Civil Case Number 1987 (W.D. Mo.1966).

6. "Staphylococci aureus" are microscopic plants, or bacteria, which are golden in pigment. Some of these organisms contain an enzyme termed "coagulase" which acts as a catalyst. Staphylococci aureus organisms that are "coagulase positive" may, under certain conditions, produce an "enterotoxin" which is poisonous to the human consumer.

7. There were, at the time, tests which basically involved feeding laboratory animals samples of the suspect product. These animal tests were conducted only after it was determined that the level of Staphylococci aureus was high in a particular product. However, the animal tests were not entirely accurate in determining the existence of the enterotoxin itself since not all animals reacted similarly. Also, there existed questions of immunity in certain individual animals and it was impossible to accurately determine in some cases whether the animals had developed symptoms of illness or not.

search in this area of microbiology in order that an accurate testing procedure might be established. Coincidently, during this time period, a scientist at the University of Chicago, Dr. Merlin Bergdoll, had developed his research in the isolation of the Staphylococci enterotoxin to the point that he had discovered a testing method which could be used to determine the presence of the toxin. Working in connection with Dr. Bergdoll, the Federal Food and Drug Administration, and its own experts, Schreiber did, in fact, develop a testing procedure which accurately indicated the presence of enterotoxin in cheese. All of the cheese in Schreiber's possession which had been manufactured by Standard was tested either by Schreiber or by the Federal Food and Drug Administration. As the result of the testing, it was ascertained that approximately 130,000 pounds of the cheese manufactured by Standard contained enterotoxin-producing coagulase positive Staphylococci aureus or the enterotoxin itself. This cheese was not fit for human consumption and was destroyed.[8] The remainder of the cheese was later sold by Schreiber in the open market.

■ From the uncontradicted expert testimony adduced at trial by plaintiff, it is clearly evident that the cheese which was found to be contaminated was manufactured by Standard between July 2, 1965 and July 20, 1965. That testimony also reveals that, prior to delivery to Schreiber, the contaminated cheese, as manufactured, contained either the enterotoxin or coagulase positive Staphylococcus aureus capable of producing the

enterotoxin.[9] Both parties have stipulated that the enterotoxin produced by coagulase positive Staphylococcus aureus is a poisonous and deleterious substance injurious to the health of the consuming human. Thus, in view of that stipulation and the testimony adduced at trial, plaintiff has established by a preponderance of the evidence that the cheese was defective before it reached the various Schreiber facilities.[10]

On February 21, 1966, a formal demand was made by Schreiber for Standard to assume the defense of all actions and claims against Schreiber arising out of the incident mentioned above and to hold Schreiber harmless from all claims. Schreiber advised Standard that it would look to Standard for the costs of defense relating to all claims based upon unfitness of the cheese for human consumption, including attorneys' fees, costs of investigation, court costs and any sums paid by way of settlement of judgment in those matters. On November 24, 1967, this action was initiated by Safeway against Schreiber. Schreiber, acting through its attorney, formally advised Standard of this litigation and demanded that Standard assume the defense. Schreiber also advised Standard that, upon the refusal of Standard to defend, Schreiber would conduct the defense of the action and that, in addition to the amount of any adverse judgment rendered against it, Schreiber would also seek recovery against Standard for its costs and reasonable expenses in defending the action, including reasonable attorneys' fees. In response, Standard refused to assume the defense of this

8. A small amount of the contaminated cheese was processed and sold as fishbait.

9. Both Dr. Vincent Zehren and Dr. James J. Jezeski testified that once cheese had been wrapped at the factory it could not be contaminated unless the package was broken. Dr. Zehren testified that previously unopened packages of Standard cheese were found to contain the enterotoxin during testing procedures under aseptic conditions.

10. Dr. Zehren testified, as an expert witness, that cheese containing either entero-

toxin or coagulase positive Staphylococcus aureus capable of producing enterotoxin is unsafe and unfit for its intended use. In addition to that specific testimony, however, it is obvious from the evidence in its entirety that cheese containing either the enterotoxin or coagulase positive Staphylococcus aureus capable of producing the enterotoxin is not suitable for the ordinary purpose for which it is used; namely, for consumption by the consumer.

action. Shortly thereafter, on January 19, 1968, Schreiber filed its third-party complaint against Standard.

Based upon the testimony and evidence presented at trial, it is clearly apparent that Schreiber is entitled to recovery as against Standard for the amount paid by Schreiber in satisfaction of the judgment rendered against it for the consumer claims initially incurred and paid by Safeway. As previously stated, the preponderance of the evidence adduced at trial established that, at the time it was delivered to Schreiber, the contaminated cheese already contained either the poisonous enterotoxin or the coagulase positive Staphylococcus aureus capable of producing the enterotoxin. Thus, at the time of its delivery, the cheese was unsafe for consumption by humans. The provisions of Mo.Rev.Stat. § 400.2–314 (1965)[11] read, in pertinent part, as follows:

"(1) Unless excluded or modified (section 400.2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

(2) Goods to be merchantable must be at least such as

\*        \*        \*        \*        \*        \*

(c) are fit for the ordinary purposes for which such goods are used."

And, under the provisions of Mo.Rev. Stat. § 400.2–104 (1965), Standard is a "merchant" for the purposes of this statutory implied warranty of merchantability.[12] Thus, since the cheese manufactured by Standard was "not fit for the ordinary purpose for which it was intended," Schreiber is entitled to the incidental and consequential damages[13]

---

11. The Missouri adoption of the Uniform Commercial Code became effective on July 1, 1965 and applies to transactions entered into and events occurring after that date. See: Mo.Rev.Stat. § 400.10–101 (1965). The evidence in this cause establishes that the contaminated cheese was manufactured between July 2, 1965 and July 20, 1965. Thus, the Code provisions are applicable to the occurrences and transactions involved herein.

12. The pertinent provision of Mo.Rev.Stat. § 400.2–104 (1965) reads as follows:
"(1) 'Merchant' means a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."
And, it has been urged that "the limiting concept of being a merchant 'with respect to goods of that kind' is to be liberally construed so as to embrace any products that are sold within the general category in which the defendant had been dealing." 1 Anderson, Uniform Commercial Code § 2–314:61, p. 581

(1970 ed.). Thus, it is obvious that Standard, as the manufacturer and continuous seller of cheese, is a "merchant" within the meaning of Mo.Rev.Stat. § 400.2–314 (1965).

13. Under the provisions of Mo.Rev.Stat. § 400.2–714 (1965), the ordinary measure of damages for breach of warranty is the difference between the goods accepted and the value they would have had if they had been as warranted, "*unless special circumstances show proximate damages of a different amount*". (emphasis added). In addition, under that section, the buyer may also recover "in a proper case any incidental or consequential damages under [Section 400.2–715]." In describing those items recoverable as incidental or consequential damages, Section 400.2–715 states, in part:
"(1) incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection \* \* \* and any other reasonable expense incident to the delay or other breach" and "(2) consequential damages resulting from the seller's breach include \* \* \* (b) injury to person or property proximately resulting from any breach of warranty." Thus, it is apparent that these statutory sections are broad enough to include indemnification

arising from that breach of Standard's statutorily-created implied warranty of merchantability,[14] including the amount of the earlier adverse judgment against it [15] and its costs and attorney fees in defending the Safeway claim.[16]

An alternative independent ground upon which Schreiber is entitled to recovery as against Standard for the amount of the judgment obtained by Safeway arises from the express warranty [17] evidenced by a guaranty agreement issued by Standard in favor of Schreiber.[18] This agreement, executed in 1955 by the president of Standard, provided that Standard would guarantee

of the buyer for third party claims against him where the warranty of merchantability has been breached by the seller. See: 2 Anderson, Uniform Commercial Code §§ 2–715:6, 2–715:27, and 2–715:40 (1971 ed.). This parallels earlier Missouri cases involving implied warranties of fitness and merchantability which were decided prior to the enactment of the Missouri Code. See, for example: Busch & Latta Paint Co. v. Woermann Construction Co., 310 Mo. 419, 276 S.W. 614 (1925); Ward v. City National Bank & Trust Co. of Kansas City, 379 S.W.2d 614, 620 (Mo.1964); and Hughes Provision Co. v. La Mear Poultry & Egg Co., 242 S.W.2d 285, 289 (Mo.Ct.App.1951). These cases should be considered as supplementary to the Code provisions. Mo.Rev.Stat. § 400.1–103.

14. It is Standard's contention that it cannot be held liable for breach of implied warranty because the defect in the cheese was impossible to detect through the use of scientific knowledge as it existed at the time of the occurrences in question. See, however: 1 Anderson, Uniform Commercial Code § 2–314:70, p. 583 (1971 ed.), stating that forseeability is not a factor in determining liability under the Code warranties. In support of its contention, however, Standard cites the Eighth Circuit decision in Ross v. Philip Morris & Company, 328 F.2d 3 (8th Cir. 1964). That case is factually distinguishable from the present case. Although there were no accurate testing procedures to determine the presence of the enterotoxin itself, there were, at the time of the occurrences in question, established procedures for determining the levels of coagulase positive Staphylococci aureus in cheese. Futhermore, it was also known at that time that a high level of coagulase positive Staphylococci aureus presented the risk of the enterotoxin. Thus, this case is factually distinguishable from the Ross case in that it was possible for the manufacturer, Standard, to determine the dangerous potentiality of its cheese. In that regard, Standard was charged with superior knowledge of the nature and quality of its product and was held as an absolute insurer against knowable dangers. Ross v. Philip Morris, supra at 13; La Plant v. E. I. Dupont DeNemours & Company, 346 S.W.2d 231 (Mo.Ct.App.1961).

15. Although Standard does not appear to seriously contest Schrieber's liability to Safeway for the consumer claims incurred by Safeway, the pre-trial order filed by both parties indicates that this is a disputed issue. However, in view of the findings above, the earlier decision of this Court with regard to the liability between Schreiber and Safeway, and the clear evidence of Schreiber's demand upon Standard to assume the defense of that claim, Standard is now precluded from challenging this liability. See: Mo. Rev.Stat. § 400.2–607 (1965); Drennen v. Wren, 416 S.W.2d 229, 233–235 (Mo. Ct.App.1967).

16. See note 13, supra, setting forth the relevant provisions of Mo.Rev.Stat. §§ 400.- 714 and 400.715 and earlier parallel Missouri cases. See, particularly: Ward v. City National Bank & Trust Co. of Kansas City, 379 S.W.2d 614, 620 (Mo. 1964), wherein it is stated:
   "The law as to implied contracts is found in 42 C.J.S. Indemnity § 24, p. 602, where we find the following concerning costs and attorney's fees in cases such as the case before us: 'Where a person is obliged to defend against the act of another, against whom he has a remedy over, he may, if such other has notice of the suit and an opportunity to defend, hold him liable not only for the amount of damages * * * but also for all reasonable and necessary costs and expenses incurred in such defense, including attorney's fees.' "

17. Under Missouri law, both an express warranty and an implied warranty may coexist. See: Mitchell v. Rudasill, 332 S.W.2d 91, 95 (Mo.Ct.App.).

18. There exists another possible alternative ground upon which Schreiber might be entitled to recovery against Standard by way of indemnification. The courts of Missouri have expressly adopted the strict

that no article delivered by it to Schreiber would be adulterated within the meaning of 21 U.S.C. § 342 [19] or within the meaning of "any identical or substantially similar state * * * law on the subject." [20] The documentary evidence offered at trial by Schreiber, including the admissions of R. L. Moore, past president of Standard, reveals the following: that the commodity guaranty agreement was executed on behalf of Schreiber at a time when Standard was business as a partnership; that the agreement was intended by the parties to be a continuing one unless it later was revoked; that, at the time it was signed, Moore was authorized on behalf of the partnership to sign the guaranty agreement; that the agreement was never revoked; and that, at the time Standard became incorporated, it assumed both the assets and the liabilities of the partnership. Furthermore, Moore testified at trial that, following its incorporation, Standard continued to produce cheese for Schreiber under the

same contract which had been in existence for approximately 15 to 20 years. Thus, it is apparent that the relationship between Schreiber and Standard did not change following the incorporation of Standard.[21] Under the circumstances, the commodity guaranty agreement continued to bind Standard following its incorporation. See: Aubertine v. Finberg, 258 S.W. 46 (Mo.Ct.App. 1924); Leckie v. Bennett, 160 Mo.App. 145, 141 S.W. 706 (1911); Investors Preferred Life Ins. Co. v. Abraham, 375 F.2d 291, 294 (10th Cir. 1967); Frantz Equipment Co. v. United States, 105 F. Supp. 490, 492, 122 Ct.Cl. 622 (1952); 19 Am.Jur.2d., Corporations § 19, p. 568, and § 1549, p. 925; and 18 C.J.S. Corporations § 143(c) (1), pp. 544–546. And, in light of the evidence adduced in this cause, there can be no question that this guaranty agreement was breached when the cheese containing enterotoxin or coagulase positive Staphylococci aureus capable of producing the enterotoxin was shipped to Schreiber.[22] Thus,

---

liability concept of Restatement § 402A. See: Williams v. Ford Motor Co., 454 S.W.2d 611 (Mo.Ct.App.1970); Keener v. Dayton Electric Manufacturing Co., 445 S.W.2d 362 (Mo.1969); and Williams v. Ford Motor Co., 411 S.W.2d 443 (Mo.Ct.App.1966). It has been urged that the manufacturer's indemnification of the retailer or the distributor for claims arising from defective products is a logical corollary of strict liability to the consumer. See: 3 Frumer and Friedman, Products Liability § 44.02 [3] (1970 ed.); 2 Anderson, Uniform Commercial Code § 2–715:40 (1971 ed.) (liability based on implied warranty). This would closely follow the earlier Missouri cases involving indemnification of the retailer where a manufacturer's negligence could be shown. See: Feinstein v. Edward Livingston & Sons, Inc., 457 S.W.2d 789 (Mo.1970); Woods v. Juvenile Shoe Corporation of America, 361 S.W.2d 694 (Mo.1962); Busch & Latta Paint Co. v. Woermann Construction Co., *supra*.

19. The provisions of 21 U.S.C. § 342 read, in relevant part, as follows:

"A food shall be deemed to be adulterated—

(a) (1) If it bears or contains any poisonous or deleterious substance which

may render it injurious to health; but in case the substance is not an added substance such food shall not be considered adulterated under this clause if the quantity of such substance in such food does not ordinarily render it injurious to health * * *."

20. The provisions of Mo.Rev.Stat. § 196.-070(1) are exactly the same as those set forth in 21 U.S.C. § 342(a) (1).

21. The minutes of the first meeting of the Board of Directors of the newly-formed Standard Milk Company state that "the corporation was organized for the purpose of acquiring the operating assets and continuing the operation of the business heretofore operated as a partnership consisting of O. E. Moore, L. E. Moore, Robert L. Moore, Donald W. Moore, and Elizabeth Irene Moore, doing business as Standard Milk Company." Those minutes also reveal that the corporate directors voted to assume the liabilities of the partnership in exchange for the partnership assets.

22. In addition to the testimony at trial that the cheese contained the enterotoxin or the enterotoxin-producing Staphylococci aureus at the time it left Standard's plant, it should be noted that Standard entered into the consent decree

based upon this breach of express warranty, Schreiber is also entitled to recovery in the amount of the earlier judgment obtained by Safeway, plus the attorney fees and expenses incurred as the result of defending Safeway's claim against it.[23]

In addition to Schreiber's claim for indemnification for the Safeway claims, Schreiber also seeks reimbursement for its expenses in testing the cheese to determine which Standard-produced cheese was actually contaminated by the enterotoxin or by coagulase positive Staphylococci aureus capable of producing the enterotoxin. While, under the facts of this case, the costs of testing incurred by Schreiber fall within the scope of recovery as "incidental damages resulting from the seller's breach,"[24] there exists a further question as to whether Schreiber's claim for these testing expenses has been settled as between the parties. Both parties agree, and the trial testimony indicates, that Schreiber and Standard have compromised all claims relating to the cheese or "product" itself, including the expenses of testing, with the exception of those claims which fall within the coverage of Standard's comprehensive liability insurance. Thus, if the testing expenses fall within the coverage of the policy which existed at the time of the occurrences herein, Schreiber is entitled to recovery for those expenditures. Conversely, if there exists no coverage under the policy, Schreiber's claim for testing expenses has been settled as between the parties.

The pertinent provisions of the existing insurance policy, issued by the Hardware Mutual Casualty Company, read as follows:

## "INSURING AGREEMENTS

"Coverage D. Property Damage Liability—Except Automobile. To pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident."

## "EXCLUSIONS

"This policy does not apply:

(a) to liability assumed by the insured under any contract or agreement except under coverages B and D, (1) a contract as defined herein or (2) as respects the insurance which is afforded for the Products Hazard as defined, a warranty of goods or products;"

\*    \*    \*    \*    \*    \*

"(j) under coverage D, to injury to or destruction of  \*  \*  \*  (4) any goods, products or containers thereof manufactured, sold, handled or distributed or premises alienated by the named insured, or work completed by or for the named insured, out of which the accident arises;"

## "CONDITIONS

"Definitions  \*  \*  \*  (f) Products Hazard. The term 'products hazard' means

---

in Case No. 1987, which enjoined Standard from transporting cheese "which is adulterated within the meaning of 21 U.S.C. § 342(a) (1) in that it bears or contains enterotoxin-producing coagulase positive Staphylococci or enterotoxins poisonous and deleterious substances which may render such cheese injurious to health.

23. See: 3 Frumer and Friedmann, Products Liability, § 44.03 [5], p. 15–40 (1970 ed.) ; Standard Oil Co. of Ind. v. Daniel Burkhartsmeier Cooperage Co., 333 Ill.App. 338, 77 N.E.2d 526 (1948). No distinction is made by Mo.Rev.Stat. §§ 400.714 and 400.715 (1965) between

the breach of an implied warranty or the breach of an express warranty. Thus, under the facts of this case, the elements of recovery should be the same on either ground. See. General Electric Co. v. Mason & Dixon Lines, Inc., 186 F.Supp. 761 (W.D.Va.1960).

24. As previously stated, under the provisions of Mo.Rev.Stat. § 400.2–715(1) (1965), incidental damages resulting from the seller's breach of warranty include *"expenses reasonably incurred in inspection  \*  \*  \*  and any other reasonable expense incident to the delay or other breach."* (emphasis added)

(1) goods or products manufactured, sold, handled or distributed by the named insured or by others trading under his name, if the accident occurs after possession of such goods or products has been relinquished to others by the named insured or by others trading under his name and if such accident occurs away from premises owned, rented or controlled by the named insured * * *."

Both parties have presented their contentions as to whether or not the commingling of the contaminated cheese with non-defective cheese constituted an "accident" which caused "injury to or destruction of property" within the terms of the policy. However, these matters of construction need not be resolved herein. For, even assuming *arguendo* that the commingling of contaminated cheese with good cheese did constitute an "accident" which caused "injury to or destruction of property", it is clear that the testing claims of Schreiber are expressly excluded from coverage under the policy in question.

▆▆▆▆ Under the law of Missouri, in the absence of ambiguity, contracts of insurance must be construed according to the terms which the parties have used as taken in their plain, ordinary, and popular sense. Community Federal Savings and Loan Assoc. of Overland v. General Casualty Co., 274 F.2d 620, 624 (8th Cir. 1960); Campbell v. American Farmers Mutual Ins. Co., 238 F.2d 284 (8th Cir. 1957); Forir v. Toman, 202 S. W.2d 32, 34 (Mo.1947). And, in the present case, no ambiguity exists with regard to the provisions of the exclusion clause of the policy presently in dispute. Under that exclusionary clause, insurance coverage is expressly precluded as to "injury to or destruction of * * * goods, products or containers thereof manufactured * * * by the named insured * * * out of which the accident arises." It is undisputed by the

parties that the entire quantity of cheese, impounded by the Government and later tested by Schreiber and the Federal Food and Drug Administration, was manufactured by Standard as its only product. Absent the subsequent development of accurate testing procedures and the isolation of the contaminated cheese, there can be no question that the ultimate loss of the entire quantity of cheese would have been excluded from coverage under the policy. See: Home Indemnity Co. v. Miller, 399 F.2d 78, 83 (8th Cir. 1968); Hauenstein v. St. Paul Mercury Indemnity Co., 242 Minn. 354, 65 N.W.2d 122, 126 (1954); Aetna Insurance Co. v. State Motors, Inc., 109 N.H. 120, 244 A.2d 64 (1968). And, if an "accident" occurred, it arose out of the commingling of both contaminated cheese and cheese which was not contaminated. All the cheese was produced by Standard. Thus, it is clear that the expenses incurred in testing the entire quantity of cheese directly within the literal and unambiguous terms of the exclusionary clause as "injury to * * * goods * * * manufactured * * * by the named insured * * * out of which the accident arises" and are, therefore, outside the coverage of the policy. Home Indemnity Company v. Miller, *supra*; Kendall Plumbing, Inc. v. St. Paul Mercury Ins. Co., 189 Kan. 528, 370 P.2d 396 (1962). Since there is no coverage as to these testing expenses, under the agreement of the parties, Schreiber's claim for those expenditures must be denied.

Accordingly, for the reasons stated above, judgment is hereby granted in favor of the third-party plaintiff and against the third-party defendant in the amount of $68,639.50, plus attorney fees and expenses in the amount of $8,999.88, and interest on the original judgment at six percentum from the date of rendition to the date of this order.[25]

It is so ordered.

25. As to interest on the judgment recovered by Safeway, see: Steckdaub v. Wilhite, ▆▆▆▆ 211 S.W. 915 (Mo.App.Ct.App.1919); 42 C.J.S. Indemnity § 13(c), p. 585 (1944 ed.).