**L. D. SCHREIBER CHEESE COMPANY, Inc., a Corporation, Appellant,**

v.

**STANDARD MILK COMPANY, Inc., a Corporation, and Hardware Mutual Casualty Company, Appellees.**

No. 71–1331.

United States Court of Appeals, Eighth Circuit.

March 16, 1972.

L. R. Buehner, Joplin, Mo., for appellant.

Harold J. Fisher, Springfield, Mo., for appellees.

Before GIBSON and HEANEY, Circuit Judges, and VAN PELT, Senior District Judge.[*]

GIBSON, Circuit Judge.

This diversity case presents another difficult issue on the coverage afforded under a comprehensive liability policy insuring liability on products manufactured by the named insured. The United States District Court for the Western District of Missouri in its opinion *sub nom.* Safeway Stores, Inc. v. L. D. Schreiber Cheese Co., 326 F.Supp. 540 (W.D.Mo., 1971), found liability against Standard Milk Company, the manufacturer of the cheese, for damages resulting to Safeway Stores as a retailer of some of the cheese and indemnity damages to Schreiber as wholesaler for its loss occasioned by reason of the same cheese sold to Safeway, plus the loss entailed by Schreiber in testing impounded cheese to separate the contaminated from the uncontaminated cheese. However, Hardware Mutual Casualty Company, the comprehensive liability carrier for Standard, was held not liable for testing costs incurred by the wholesaler Schreiber. The only question on appeal is the propriety of the latter holding.

In an agreement among the wholesaler Schreiber, the manufacturer Standard, and the insurer Hardware Mutual, the liability of Standard to Schreiber was settled by a compromise agreement reserving the claim for the testing expense against the insurer Hardware Mutual Casualty Company, which became a third-party defendant.

For several years prior to the occurrences causing this lawsuit Schreiber purchased the entire output of cheese produced by Standard and sold a large quantity of it to Safeway for resale. The cheese was packaged in 40-pound blocks when delivered to Schreiber, who placed the cheese in refrigerated storage for later delivery to Safeway and others. The cheese in question was manufactured in vats that would accommodate 20,000 pounds of milk from which 2,000 pounds of cheese would be manufactured. Various tests would be run on the cheese but at this stage there was no test for the presence of bacteria.

In September, 1965, complaints were received from the West Coast from persons made ill from eating the cheese.[1] As a result of these complaints all cheese manufactured by Standard was removed from the Safeway Stores and destroyed. There remained in storage approximately 4,000,000 pounds of Standard cheese which by court action was restrained from sale until tests could be performed to establish whether or not it was suitable for human consumption.

At that time there were no tests generally recognized that would be capable of discovering the existence of enterotoxin. Schreiber assumed the laboring oar of contacting scientists who in conjunction with the Federal Food and Drug Administration developed an acceptable test that would determine the presence of the enterotoxin. As a result of the testing, approximately 130,000 pounds of the 4,000,000 pounds of impounded cheese was found to contain the enterotoxin and thus unfit for human consumption. The contaminated cheese was destroyed and the remainder of the cheese found to be unadulterated was sold by Schreiber in the open market. The cheese containing the enterotoxin was manufactured by Standard between July 2 and July 20, 1965, and was estab-

---

[*] Senior District Judge for the District of Nebraska, sitting by designation.

[1.] It developed that the cheese causing illness was contaminated by the presence of "coagulase positive Staphylococci aureus." These are microscopic plants, or bacteria, some of which contain an enzyme termed "coagulase" which acts as a catalyst. Those that are "coagulase positive" may, under certain conditions, produce an "enterotoxin" which is poisonous to the human consumer.

lished to be contaminated in the manufacturing process prior to its delivery to Schreiber. The testing expense amounted to approximately $118,000.

Under Coverage D, Property Damage Liability, Hardware agreed "to pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident." However, under "Exclusions" the policy does not apply: "to injury to or destruction of * * * (4) any goods [or] products * * * manufactured, sold, handled or distributed * * * by the named insured * * * out of which the accident arises."

The District Court found that there was no coverage for the testing expense as it was an expense incurred as a result of injury to goods manufactured by the named insured out of which the accident arose and thus excluded by the terms of the exclusionary clause. The District Court held:

"[T]hat the expenses incurred in testing the entire quantity of cheese falls directly within the literal and unambiguous terms of the exclusionary clause as 'injury to * * * goods * * * manufactured * * * by the named insured * * * out of which the accident arises' and are, therefore, outside the coverage of the policy. Home Indemnity Company v. Miller, supra [399 F.2d 78 (8th Cir., 1968)]; Kendall Plumbing, Inc. v. St. Paul Mercury Ins. Co. [189 Kan. 528], 370 P.2d 396 (1962)," 326 F.Supp. at 513.

On this appeal, Schreiber contends that the District Court erred in failing to give proper effect to the phrase "out of which the accident arises." Schreiber asserts that the pur-

pose of the exclusionary clause is to exclude only those items produced by the insured which caused the damage and if other products of the insured are damaged the policy does not exclude recovery for them. In conjunction with this argument Schreiber advanced the theory that the accident out of which the damage to the cheese in storage arose was the illnesses caused by the cheese on the West Coast, as this resulted in the subsequent restraint on the four million pounds of cheese in storage and the consequential testing expenses. However, the fact that people became sick after eating the cheese, while it does constitute an accident, is obviously not the accident which caused the damages with which we are here concerned. It seems logically to be only symptomatic of the accident, the contamination of the product, which occurred in the manufacturing process.[2]

Thus, the adulteration of the cheese caused both the sickness and the impoundment. Schreiber's contention that the illnesses on the West Coast caused the impoundment and the resulting damages lacks factual support.

In the alternative, Schreiber suggests that we should consider only the adulterated cheese to be the product out of which the accident arose. This it contends would place liability with the insurance carrier (via the manufacturer) to recover the cost of separating the bad cheese from the good cheese.

The insurer Hardware points out that if all of the cheese had been bad there could be no recovery under the policy for testing. This would be correct as the damage would arise out of all the cheese manufactured. That, however, is not this situation. Also, the insurer contends that if the cheese had not been distributed for retail sale but remained in storage, apparently impounded, any

2. The product could be condemned only on the showing that it was adulterated within the meaning of 21 U.S.C. § 342. 21 U.S.C. § 334 provides that "Any article of food * * * that is adulterated * * * shall be liable to be proceeded against * * * and condemned * * *." 21 U.S.C. § 342 provides "A food shall be deemed to be adulterated— (a) (1) If it bears or contains any poisonous or deleterious substance which may render it injurious to health."

damage to the cheese involved would be an injury prior to use and not covered under the policy. We cannot accept this analysis and it requires no further consideration as it does not correspond to the factual situation under consideration. Nor can we accept the insurer's contention that the commingling of the good and bad cheese did not change the character of the good cheese nor did it change the character of the bad cheese and neither was affected by being commingled with the other. Obviously for all practical purposes the commingling of the good and bad cheese resulted in a legal restraint upon the use and salability of the good cheese. The good cheese, therefore, had to be adversely affected by being commingled with the bad.

In this evolving field of insurance coverage on products hazards or products liability, the substantive laws of the various states are understandably not in agreement and the issue here presented, being novel on its facts, presents difficulties. The District Court viewed the accident as arising out of the commingling of the good and bad cheese and since all of the cheese was manufactured by Standard, it felt that the entire quantity of cheese fell directly within the exclusionary clause of goods manufactured out of which the accident arose.

The substantive law of Missouri applies but there are no Missouri cases. The Eighth Circuit case decided under Missouri law of Home Indemnity Co. v. Miller, 399 F.2d 78 (8th Cir., 1968), relied on by the District Court, held there was no coverage under a similar policy where improperly constructed footings and improper installation of roof caused the exterior walls of the house to crack where the house was the completed product of the insured.

The Court in *Home Indemnity* viewed the completed home as the product of the insured out of which the accident arose. There the plaintiff conceded that the damage involved was embraced within the exclusionary provision but claimed that provision ambiguous in reference to the term "products hazard"

and policy definition of "operations." *Home Indemnity* in turn relied upon another Eighth Circuit case of St. Paul Fire & Marine Ins. Co. v. Northern Grain, 365 F.2d 361 (8th Cir., 1966), which dealt with the substantive law of South Dakota. In *St. Paul Fire* the Court allowed recovery under a products hazard policy where the insured Grain Company mistakenly sold wheat seed that was less productive than the seed ordered. That case turned on the interpretation of "accident" under the policy, but in interpreting a similar exclusionary clause, the Court held:

"Considered in its proper perspective, the function of the exclusionary clause denying coverage of damages for 'injury to or destruction of * * * any goods, products or containers thereof manufactured, sold, handled or distributed by the *Insured* * * *' is clear. Such a provision denies coverage to an insured for damages occasioned to his own goods or work product by reason of its internal defectiveness. The exclusionary clause, however, has no reference to damage to property other than the insured's goods or products or other accidental loss resulting from the defective condition of the insured's work product." 365 F.2d at 368.

It thus appears that the crucial issue in this case is the interpretation to be given to exclusionary clause "(j) (4) * * * products * * * manufactured * * * by the named insured * * * out of which the accident arises."

Some courts have been able to make a distinction in cases where an entity made by the insured is composed of components made either by the insured or another, and one of the component parts is defective and damages the entity. In such a case, these courts would allow recovery against the liability carrier for the entity less the cost of the defective component by construing the "out of which the accident arises" exclusion as only applicable to the part or component that was defective.

In S. L. Rowland Constr. Co. v. St. Paul Fire & Marine Ins. Co., 72 Wash.2d 682, 434 P.2d 725 (1967), the court was faced with the problem of determining the extent of liability of the insurance carrier for the builder of a home that was damaged by fire due to the negligent construction of the house. The contractor had placed wooden floor joists or headers in contact with or in close proximity to the firebox of an upstairs fireplace in such a manner that they were caused to ignite when the fireplace was used. The court was faced with a similar exclusion for goods of the insured out of which the accident arose. The court held it did not apply to the entire house as being the product of the insured but only the component parts of the house, i. e., the headers, out of which the accident arose. The court held that the policy covered the damage to the house except the specific components out of which the accident arose.

A similar result was reached in Owens Pacific Marine Ins. v. Insurance Co. of North America, 12 Cal.App.3d 661, 90 Cal.Rptr. 826 (1970). In that case a boat dealer added a hot water heater to a boat which he then sold. The hot water heater caused an explosion and the boat was completely destroyed. The court held that the heater was the product out of which the accident arose, and allowed recovery for damage to the boat.

Another distinction between the cases is made in Pittsburg Bridge & Iron Works v. Liberty Mutual Ins. Co., 444 F.2d 1286 (3rd Cir., 1971). The court there found that the cases generally involved one of two situations:

"(1) Where X supplies a part to Y who constructs an entity from X's part and from other parts and X's part proves defective causing damage to the entity;

"(2) Where X himself constructs an entity from his own parts or others' parts and

"(a) a part of the entity is defective and causes damages to someone or something other than the entity, or

"(b) a part of the entity is defective and causes damages to the entity itself."

444 F.2d at 1288.

Of situation (1) the court says:

"In [situations] (1) and 2(a) it is clear, and the cases are uniform, that the * * * exclusion is inapplicable, and that there is coverage and the insurer must defend any suit brought by the injured party against X." Id.

The court cites Hauenstein v. St. Paul Mercury Indemn. Co., 242 Minn. 354, 65 N.W.2d 122 (1954); Dakota Block Co. v. Western Cas. & Sur. Co., 81 S.D. 213, 132 N.W.2d 826 (1965); and Pittsburg Plate Glass Co. v. Fidelity & Cas. Co., 281 F.2d 538 (3rd Cir., 1960), as representative of the cases involving situation (1).

As to situation (2) (b), the court observes that the authorities are divided but the weight of the authorities is in favor of no liability coverage because of the exclusion. See, e. g., Volf v. Ocean Accident & Guar. Co., 50 Cal.2d 373, 325 P.2d 987 (1953); Vobill Homes, Inc. v. Hartford Accident & Indem. Co., 179 So.2d 496 (La.App.1965); Home Indem. Co. v. Miller, supra. However, Pittsburg Bridge concluded that the clause was ambiguous as applied to its unusual facts and found coverage in a situation such as (2) (b). Rowland, supra, found coverage by a narrower reading of the exclusion to exclude only the defective component.

The novel factual situation in the instant case does not fit neatly into any of the broad categories noted in Pittsburg Bridge, as we are not here dealing with a completed entity or structure nor are we considering fungible goods where a defective portion has permeated the entire lot. Rather we have a series of separately produced products, a small percentage of which was contaminated in the manufacturing process. The contaminated products were after delivery inadvertently and unknowingly commingled in storage with the non-contaminated products. The impoundment of all the cheese pending adequate testing ne-

cessitated then considerable expense in testing to restore the salability and use of the non-contaminated products.

Of course, the entire lot of cheese was impounded or restrained because of the enterotoxin found in some of the cheese manufactured by Standard. While we do not accept appellant Schreiber's theory that the accident arose out of the West Coast complaints and did not arise out of any of the impounded cheese, it is apparent to us that at least two accidents within the meaning of the policy occurred—first, when the adulterated cheese was manufactured; and second, when it was commingled with the good cheese. Upon testing only 2.9 per cent of the cheese was found to be adulterated. Thus viewed, the commingling of the cheese was an occurrence, mishap, or accident which resulted in injury to the purchaser, Schreiber, and to the insured, Standard, in the expense of testing necessitated by the impoundment of all the cheese.

The non-adulterated cheese was not affected by the adulterated cheese except that vital testing procedures had to be provided and expenses incurred in separating it from the bad cheese.

It thus appears that if the entire lot of the cheese in storage is to be considered as a product out of which the accident arises, the exclusionary clause would be applicable and there would be no coverage under the policy. *Home Indemnity* supports this conclusion, as does Kendall Plumbing, Inc. v. St. Paul Insurance Co., 189 Kan. 528, 370 P.2d 396 (1962).

We think, however, unless Missouri law is to the contrary, the exclusionary clause should be interpreted under contemporary insurance law principles to exclude only the injury to the contaminated cheese manufactured by the insured as the product "out of which the accident arises" and consequential testing expense incurred in testing the good cheese would be covered under the policy. The cases of S. L. Rowland Construction Co. v. St. Paul Fire & Marine

Ins. Co., *supra*; Owens Pacific Marine, Inc. v. Insurance Co. of North America, *supra*; and Hauenstein v. St. Paul Mercury Indemn. Co., *supra*, would support this conclusion.

Is Missouri law to the contrary? Since there are no Missouri cases, Home Indemnity Co. v. Miller, 399 F.2d 78 (8th Cir., 1968) construing Missouri law would be the controlling authority if its ruling is in point on this issue. We feel, however, that there is a crucial difference in the factual situation in the instant case from *Home Indemnity Company*, in that in the latter the parties conceded the applicability of the exclusionary clause and in the characterization of the home as the completed product of the insured out of which the accident arose. In the instant case, numerous different vats of cheese were produced during the period in question and only about 3 per cent of the cheese manufactured proved to be adulterated. After laborious testing procedures, the offending cheese was isolated and found to have been manufactured only during a relatively short period of time, July 2–July 20, 1965, and even then out of the 20 vats a day manufactured only one or two were contaminated. Thus, the product here is cheese manufactured on different dates in separate vats, and separately packaged in 40-pound blocks. These different blocks of cheese should not be considered as a whole product or one installation or one completed work product by the insured as in *Miller*. The commingling of the bad and good cheese was an unforeseen event, a mishap, an accident under the policy. Schreiber through Standard has the right to protect its purchase by instituting adequate testing procedures to save the good blocks of impounded cheese. This testing expense is a consequence of the commingling of the good and bad cheese and the impoundment thereof. To the extent that the testing costs relate to the good cheese, the expense thereof is covered under the policy; the testing expense that is attributed to the cheese found to be adulterated would be

within the exclusionary clause and not covered by the policy.

This decision is not inconsistent with our holding in Western Cas. & Sur. Co. v. Polar Panel Co., 457 F.2d 957 (8th Cir., 1972), decided this same day. In that case, decided under Minnesota law, the completed warehouse building was an entity constructed by someone other than the insured which was damaged by the incorporation of the defective work product of the insured. Damages were allowed for the diminution in value of the entity under Hauenstein v. St. Paul Mercury Indemn. Co., *supra*. In this case the entire lot of cheese should not be treated as an entity.

Judgment reversed and cause remanded to the District Court for entry of judgment in favor of the appellant in an amount consistent herewith.