**BLOMMER CHOCOLATE COMPANY, Employers Insurance of Wausau, and Old Republic Insurance Company, Plaintiffs,**

v.

**BONGARDS CREAMERIES, INC., and J.M. Swank Company, Inc., Defendants.**

**J.M. SWANK COMPANY, INC., Third party plaintiff,**

v.

**PACEMAKER, LTD., Third party defendant.**

No. 83 C 536.

United States District Court, N.D. Illinois, E.D.

April 14, 1986.

Deborah L. LaDolce, Law Offices of Roderick J. Bergin, Chicago, Ill., for defendant/cross-claimant/third party plaintiff.

James T. Martin, Gislason and Martin, Edina, Minn., William E. Spizzirri, Chicago, Ill., for third party defendant and defendant/cross-defendant.

## MEMORANDUM AND ORDER

MORAN, District Judge.

This action arose when plaintiff Blommer Chocolate Company discovered salmonella contamination in several hundred thousand pounds of its chocolate products in 1982. The facts are set out at length in an earlier memorandum and order of this court, *Blommer Chocolate Company v. Bongards Creameries, Inc.*, 635 F.Supp. 911, 913–915 (N.D.Ill.1985). Briefly, Blommer traced that contamination to its own satisfaction to four lots of dry whey powder, a component in its chocolate, which had been manufactured by defendant Bongards Creameries, Inc. Though Bongards had found no salmonella in the whey when it checked a random sample as part of its usual testing program, tests and serotyping revealed salmonella cubana (one of some 1,500 distinct strains of salmonella) in the chocolate, an unopened bag of whey, and whey tailings (residue in the processing machinery) at Bongard's plant. The plant had a history of occasional incidents of salmonella contamination. Blommer purchased the whey form defendant/third party plaintiff J.M. Swank Company, Inc., a food broker. Swank had ordered the whey from third party defendant Pacemaker, Ltd., a dairy products broker, who had arranged for its manufacture by Bongards. The whey was shipped directly from Bongards to Blommer in sealed plastic-lined bags; though Swank legally took possession of the whey at Bongards' plant, in fact no one from Swank ever touched or even saw it. Once Blommer had decided that the whey had contaminated the chocolate, it refused to pay Swank for the remaining whey and

brought this action against Swank and Bongards.

The issue presently before this court is whether Swank can assure itself of shifting all of its eventual losses to Pacemaker and Bongards. As soon as Blommer sued Swank, Swank "vouched in" Pacemaker, following the procedures laid out in section 2–607(5) of the Uniform Commercial Code (UCC), Illinois Revised Statutes ch. 26, ¶ 2–607(5). When Pacemaker rejected Swank's tender of defense, Swank also impleaded Pacemaker into this action on a third party complaint which, as amended, contains nine counts. In addition, Swank filed a cross-claim against Bongards using identical counts and theories.

This court in its June 28 order granted summary judgment for Blommer against Swank on three breach of warranty counts: breach of an express warranty that the whey would be salmonella-free, of the implied warranty of merchantability, and of the implied warranty of fitness for a particular purpose. Swank now moves for summary judgment against both Pacemaker and Bongards on seven of the nine counts it has against each of them. On counts I through IV, warranty and indemnity counts, it moves for partial summary judgment, specifically that Pacemaker and Bongards will be liable to Swank for Swank's liability to Blommer. On counts VII through IX, Swank's claims through breaches of warranties for its own losses in the transaction, Swank moves for summary judgment against both Pacemaker and Bongards for the cost of the three shipments of whey for which it had paid Pacemaker and was never paid by Blommer. Its motion is granted in part and denied in part.

### DISCUSSION

■ Bongards and Pacemaker do not have identical status before this court. Pacemaker was vouched in under UCC § 2–607(5) and impleaded under Federal Rule of Civil Procedure 14; Bongards was not. However, Bongards has recently accepted a tender of defense from Pacemak-

er. It will therefore be bound by any judgment against Pacemaker. *Ocean Accident & Guarantee Corp. v. Felgemaker*, 143 F.2d 950, 952 (6th Cir.1944). For that reason there is no need for a separate discussion of Swank's claims against Bongards.

### 1. Vouching in Under the UCC

"Vouching in" pursuant to the UCC is a device similar in nature to impleader. The text of the statute reads:

Where the buyer is sued for breach of a warranty or other obligation for which his seller is answerable over he may give his seller written notice of the litigation. If the notice states that the seller may come in and defend and that if the seller does not do so he will be bound in any action against him by his buyer by any determination of fact common to the two litigations, then unless the seller after seasonable receipt of the notice does come in and defend he is so bound. UCC § 2–607(5)(a).

The use of voucher, like impleader, depends first of all on the possibility that a third party is or may be liable to the defendant for the injury of which the plaintiff complains. The process in a typical products liability action for breach of warranty would work as follows. When a consumer sues a retailer for breach of warranty, the retailer seeks to shift liability to the manufacturer of the product, maintaining that the consumer's injury stems from the manufacturer's breach of the same warranty when the product was sold to the retailer. The retailer tenders defense to the manufacturer in the manner prescribed by § 2–607(5). If the manufacturer (the vouchee) rejects that tender from the retailer (the voucher), the manufacturer is vouched in. *See generally* D. Mixon, *Voucher to Products Liability: The Mechanics of U.C.C. § 2–607(5)(a)*, 29 Ark.L.Rev. 486 (1976).

■ A judgment against the voucher does not automatically make the vouchee liable over for the judgment the voucher owes. That question remains to be litigated in their own suit, and the vouchee can

assert there any defenses he has against the voucher. The judgment binds the vouchee as to those issues common to the two litigations (plaintiff-voucher and voucher-vouchee) which were actually determined and necessary to the judgment. *International Harvester Co. v. TRW, Inc.,* 107 Idaho 1123, 695 P.2d 1262 (1985); Mixon, *supra,* at 504. Ordinarily these common issues will be the existence of a breach of warranty as between the voucher and the plaintiff, the fact of the voucher's liability to the plaintiff, and the amount of damages the voucher must pay the plaintiff as a result of the judgment against him. *TRW,* 695 P.2d at 1265; Mixon, *supra,* at 504–505. The effect, then, also is similar to that of impleader, where a judgment against the defendant/third party plaintiff usually binds the third party defendant on the fact of the former's liability and the amount of the damages he must pay. *Barron v. United States,* 654 F.2d 644, 649 (9th Cir.1981); *Bosin v. Minneapolis, St. Paul & Sault Ste. Marie Railroad,* 183 F.Supp. 820, 823 (E.D.Wis.1960), *aff'd* 297 F.2d 583 (7th Cir.1961). *See* 3 Moore, *Moore's Federal Practice* ¶ 14.13 (1985).

■ Swank does not cite and this court has not unearthed any case which squarely holds that a summary judgment binds a vouchee on the common issues. However, neither is there a case which squarely holds that it does not bind and we see no reason in the instant case why it should not. There are some situations in which a judgment cannot be used against a vouchee. For example, the judgment does not bind the vouchee if it was obtained through a settlement. *Stewart & Foulke, Inc. v. Robertshaw Controls Co.,* 397 F.2d 971 (5th Cir.1968); *CGM Valve Co. v. Gulfstream Steel Corp.,* 596 S.W.2d 161 (Tex.Civ.App. 1980). Given the similarities between voucher and impleader, the principle that a judgment will not bind a third party defendant if liability was grounded on the defendant/third party plaintiff's admission of liability probably also applies to voucher cases. *See St. Joseph Light & Power Co. v. Zurich Insurance Co.,* 698 F.2d 1351,

1362 (8th Cir.1983); *Dewald v. Minster Press Co.,* 494 F.2d 795, 798 (6th Cir.1974).

■ On the basis of the same similarities, however, a summary judgment would have binding effect. What is required is an "arm's length good faith adversary proceeding." *CGM,* 596 S.W.2d at 63, *quoting Stewart,* 397 F.2d at 974. A summary judgment which is a good faith adversary proceeding can bind an impleaded party. *See F. & D. Property Co. v. Alkire,* 385 F.2d 97, 98 (10th Cir.1967); *United States v. National City Bank of New York,* 32 F.Supp. 890, 893 (S.D.N.Y.1940). Swank proceeded here as an adversary in good faith; indeed, this court expressly commented on its "valiant effort to avoid summary judgment." *Blommer,* 635 F.Supp. at 915. The judgment here therefore fits the requirements for application of UCC § 2–607(5).

■ A judgment against the voucher tends to significantly accelerate determination of the vouchee's liability. When both actions are grounded in warranty, the vouchee will ordinarily be liable over unless he can show one of the following: (1) that he was not properly vouched in; (2) that he did not sell the product which gave rise to plaintiff's action; (3) that the warranty he gave the voucher differed materially from the warranty the voucher gave the plaintiff; or (4) that he did not breach the warranty, at least not in a way which caused plaintiff's injury. *Ford Motor Co. v. Bendix Corp.,* 83 Mich.App. 108, 268 N.W.2d 305 (1978); *Frank R. Jelleff, Inc. v. Pollak Bros., Inc.,* 171 F.Supp. 467, 470–472 (N.D. Ind.1957) (under Uniform Sales Act, predecessor of the UCC's Article 2). If no genuine issue of fact exists on any of these questions the result should be summary judgment for the voucher. *Bendix,* 268 N.W.2d at 307. *Cf. Uniroyal, Inc. v. Chambers Gasket and Manufacturing Co.,* 177 Ind.App. 508, 380 N.E.2d 571 (1978).

Following this analysis, then, Swank has grounds for a summary judgment against Pacemaker unless there is a problem with the vouching in, the sale, the warranties or

causation. Two of these questions can be disposed of quickly. Swank's letter to Pacemaker of May 31, 1983 complied with the standards of UCC § 2–607(5) for proper vouching-in. *See Crews v. Ramirez,* 18 U.C.C.Rep.Serv. 919 (Cal.App.1976). Pacemaker does not deny that it sold the whey. If Pacemaker is to avoid summary judgment on the warranty counts, then there must be a genuine factual issue either that its warranties to Swank differed materially from Swank's warranties to Blommer or that it did not breach any of those warranties in a way which caused Blommer's damages.

**2. Implied Warranty of Merchantability**

■ For count II of Swank's complaint, Pacemaker's warranty was identical to Swank's, so only causation is at issue. In Count II, Swank alleges that its liability to Blommer for breach of the implied warranty of merchantability imposed by UCC § 2–314 stemmed from Pacemaker's breach of the same warranty in supplying whey contaminated with salmonella to Swank. Each merchant in the chain of distribution of a product gives the implied warranty of merchantability unless he has expressly disclaimed that warranty. UCC § 2–314(1). Absent such a disclaimer, a merchant vouched-in or impleaded on the basis of the implied warranty of merchantability cannot contend that he is not liable on the ground that the warranties differed. *See Jelleff,* 171 F.Supp. at 472; *Safeway Stores, Inc. v. L.D. Schreiber Cheese Co., Inc.,* 326 F.Supp. 504, 509 (W.D.Mo.1971), *rev'd on other grounds,* 457 F.2d 962 (8th Cir.1972). *Safeway* has several similarities to the instant case. A food product gave rise to that action, namely cheese contaminated with staphylococcus bacteria. The grocery which had incurred loss in selling it sued the distributor of the cheese and the distributor tendered defense to the manufacturer. When the manufacturer rejected the tender of defense, the distributor filed a third party complaint against it. The court held that a judgment based on a breach of the implied warranty of merchantability by the distributor gave the distributor a right of indemnity from the manufacturer for a breach of the same warranty unless there was a causation problem. 326 F.Supp. at 509–510. Pacemaker does not contend that it disclaimed the implied warranty of merchantability. A judgment against Swank on that warranty therefore leaves only causation to be determined between Swank and Pacemaker.

■ This court's earlier order contained such a judgment. The presence of bacteria in a food product destined for humans which makes it unsafe for human consumption ordinarily breaches the implied warranty of merchantability. *Safeway,* 326 F.Supp. at 509. Salmonella, of course, are bacteria which make food unsafe. Under the statute goods are not merchantable unless they would "pass without objection in the trade under the contract description." UCC § 2–314(2)(a). This court found in its judgment against Swank that whey with salmonella would not pass without objection in the trade. *Blommer,* 635 F.Supp. at 913. Our decision included a grant of summary judgment to Blommer on count II, the implied warranty of merchantability count. *Id.* at 916. Pacemaker is thus liable over to Swank unless there is a question about causation.

■ This court's opinion on Blommer's motion for summary judgment found no genuine issue as to causation. All the evidence pointed to Bongards' whey as the source of the contamination of Blommer's chocolate. *Blommer,* 635 F.Supp. at 915–916. The bags of whey were sealed when they left Bongards. The chocolate, the bags and the machinery at Bongards were all contaminated by an identical strain of salmonella out of fifteen hundred possible strains. Salmonella had been found in Bongards' plant in the past. Without some alternative theory which could explain where the salmonella came from and some evidence to support it, neither of which was offered, there

was simply no triable issue of fact on the question. *Id.* at 916.

 Pacemaker, however, now argues that a genuine issue about causation exists as between it and Swank. A vouchee is liable only when plaintiff's damages were the proximate result of the vouchee's breach of warranty. *Black v. Don Schmid Motor, Inc.*, 232 Kan. 458, 657 P.2d 517, 529 (1983). If the vouchee did not in fact breach the warranty in question, then he cannot have caused the plaintiff's injuries and will not be liable over. To meet that argument, the voucher must show that he is not responsible for a change in the condition of the product after the vouchee sold the product to him which could have caused or contributed to plaintiff's injury. *Uniroyal*, 380 N.E.2d at 582; *Safeway*, 326 F.Supp. at 508. Pacemaker attempts to create an issue of fact on the condition of the whey by supplying a food scientist's expert opinion. Pacemaker's expert points to Bongards' tests of samples out of each lot, which showed up negative for salmonella. A level of contamination as high as that shown in the whey once it reached Blommer, he argues, would probably have been detected in Bongards' test. Therefore, Pacemaker contends, there must have been a change in the condition of the whey for which Swank might be responsible.

As a threshold matter to considering that evidence, this court notes that we are not entirely certain that Pacemaker is still entitled to submit it at this late date. This court dealt with the question of how the salmonella came to be present in the whey, at length, for purposes of Blommer's summary judgment motion against Swank. Pacemaker's expert's opinion would have been more usefully offered then.

 Pacemaker explains its delay by saying that it did not until now have standing to submit materials in opposition. What little case law there is, however, is to the contrary. Pacemaker was not only vouched into this action but also impleaded. As the court in *Knell v. Feltman*, 174 F.2d 662, 665 (D.C.Cir.1949), said in a similar context, "when he had been brought in as a

third-party defendant, he was in the thick of the fray, and entitled to participate to the fullest extent as though he had been originally a defendant. To the extent that he failed to exercise that privilege of participation, he did so at his peril. . . ." A third party defendant is, for example, fully empowered to demand a jury trial. *State Mutual Life Assurance Co. v. Arthur Andersen & Co.*, 581 F.2d 1045, 1050 (2d Cir.1978). Had this case gone to trial Pacemaker could have presented its own evidence, *St. Joseph*, 698 F.2d at 1363; made its own argument to the jury, *Lecklikner v. Transandina Compania Naviera, S.A.*, 390 F.2d 179, 181 (3d Cir.1968); and objected to jury instructions, *Gilchrist v. Mitsui Sempaku K.K.*, 405 F.2d 763, 766 (3d Cir. 1968), *cert. denied* 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969). There seems to be no good reason why Pacemaker would not have similar rights before trial. The *Alkire* court therefore held that "[q]uite clearly a third party defendant may resist plaintiff's motion for summary judgment to the same extent as the defendant." 385 F.2d at 100. *Accord: National City Bank*, 32 F.Supp. at 891. *See also Faser v. Sears, Roebuck & Co.*, 674 F.2d 856, 858 (11th Cir.1982) (rights of third party defendants when defendant/third party plaintiff moves for summary judgment against plaintiff). The usual result when a third party defendant has a right and fails to exercise it at the appropriate time is that the right has been waived. *Gilchrist*, 405 F.2d at 766 and n. 2; *Alkire*, 385 F.2d at 100.

 However, this court need not rest its decision solely on the intricacies of third party practice. Even with Pacemaker's evidence, there is no genuine issue of fact as to whether Pacemaker breached its warranty to Swank in a way which caused Blommer's injuries. The same evidence which pointed to Bongards as the source of the contamination is still relevant and still points to Bongards. Faced with that evidence, a rational trier of fact would still have to find that the whey was contaminated with salmonella when it left Bon-

gards' plant unless there was some evidence which affirmatively pointed in a different direction.

Pacemaker has not supplied such evidence. Pacemaker's expert argues from silence, the failure of Bongards' test to detect salmonella. The stance might carry weight if this were a negligence action. But Swank's claim is for breach of warranty, not negligence. Any contamination of the whey breached the warranty no matter how careful Bongards was. Pacemaker's argument thus has value here only if one can assume that the test would definitely have detected the salmonella if it were present at the time of testing. Pacemaker's expert, however, admits that no random testing procedure is guaranteed to direct the presence of salmonella. Swank provides an expert, a microbiologist, who offers one example of why. The FDA's test found salmonella in the tailings in the sifters at Bongards' plant. A tailing, or chunk of whey, could well have been the source of contamination. Contamination from a chunk, however, leads to non-random distribution of organisms in the product. A sample which failed to include the tailing or the whey immediately next to it in the bag would still test negative. The negative reading at Bongards, then, does not affirmatively point to a different source of contamination.

Indeed, if anything, the additional evidence, taken as a whole, supports the conclusion that Bongards, and so Pacemaker, was responsible for the contamination. Pacemaker's argument from silence would not be persuasive even in a negligence action unless Bongards' testing was up to an appropriate standard. Deposition testimony and the analysis of Swank's expert suggest that the testing could have failed to find salmonella even if it were present in the laboratory sample. For example, the person in charge of Bongards' testing lacks a high school diploma and has had no formal training in microbiology or even biology. She incubated the samples at 47°, a temperature not particularly conducive to the survival of salmonella (35° or lower is preferred). The negative reading at Bon-

gards simply is not a positive indication that the contamination came from anywhere else.

In *Safeway*, evidence that the cheese packages had been sealed at the factory and were contaminated when opened established the maker's responsibility for the contamination. 326 F.Supp. at 508 n. 9. The only reasonable inference that a trier of fact could make from the evidence Swank provides is that the whey was contaminated when it left Bongards. Pacemaker offers in opposition no alternative theory and no hard evidence, only speculation. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... [It] must come forward with specific facts showing that there is a *genuine issue for trial.*" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, ——, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (emphasis in original). There is no genuine question that the whey Pacemaker provided contained salmonella and so breached the warranty of merchantability. That salmonella caused Blommer's injuries. Swank is entitled to partial summary judgment on count II on the question of liability.

### 3. Express Warranty

Swank's count I alleges that the same facts constitute a breach of Pacemaker's express warranty of a salmonella-free product. As in the implied warranty of merchantability count, Swank, having vouched in Pacemaker, is entitled to summary judgment unless there is a genuine issue either that the warranty is materially different or on causation. This court's resolution of the causation issue, above, applies equally to this count. The only open question, then, is a possible variance in warranties.

Pacemaker argues precisely that the warranties differed. Under UCC § 2–313 any description of the goods or any affirmation of fact or promise which relates to the goods that is part of the basis of the

bargain creates an express warranty to which the goods must conform. Swank's invoices expressly promised Blommer` a product which was guaranteed salmonella-free. Pacemaker's invoices called merely for "extra grade" whey, and that term, says Pacemaker, implies nothing about salmonella content.

■ It is true that Swank's warranties to Blommer included additional assurances about the absence of salmonella. A difference in language is immaterial, however, if Pacemaker nevertheless expressly warranted a product without salmonella and delivered one with it. This court has already held, in finding summary judgment for Blommer, that among merchants in whey the term "extra grade" is an express warranty which means salmonella-free and fit for human consumption. Not only officers of Blommer and Swank, but even two officers of Bongards, testified by affidavit that extra grade whey is whey without salmonella. *Blommer*, 635 F.Supp. at 913, 915, 917, 918. As on the previous count, however, Pacemaker seeks to present evidence to counter that conclusion which, it maintains, it could not have offered before. For this count, the evidence is affidavit testimony from both Pacemaker's president and its expert that "extra grade," they believe, does not necessarily mean "salmonella-free." This evidence, Pacemaker argues, shows that "extra grade" as a warranty is at least an ambiguous term and the ambiguity cannot be resolved at summary judgment.

■ As on the previous count, there is at least a question as to whether Pacemaker could not have offered these materials before and is not therefore barred from submitting them now. Nevertheless, as on the previous count, we need not rest our holding on that technical ground. Another term of the contract between Swank and Pacemaker provides additional information as to the express warranty Pacemaker gave. Each of the purchase orders Swank sent to Pacemaker contains the preprinted clause, "All deliveries must conform in every respect to U.S. Federal Foods, Drug and Cosmetic Act." By responding to Swank's order with performance, Pacemaker accepted that term as part of the contract between them. UCC § 2–206(1)(b) and Comment 2.[1] The presence of that term strongly supports Swank's claim for breach of warranty, since whey with salmonella does not conform to that Act.

A product cannot conform to the Food, Drug and Cosmetic Act if it is "adulterated." 21 U.S.C. § 331(a). According to testimony provided by Swank, the Food and Drug Administration considers any food product, including whey powder, "adulterated" if any salmonella bacteria are present in it. Cases construing the Act fully support that stance. The Act defines "adulterated" as including, among other things, the addition of "any poisonous or deleterious substance" to food "which may render it injurious to health." 21 U.S.C. § 342(a)(1). If the substance is considered not to be added, but rather one naturally occurring in the food, the test is whether the substance is present in a quantity which would "ordinarily render it injurious to health." *Id.; see, e.g., United States v. Anderson Seafoods, Inc.*, 622 F.2d 157 (5th Cir.1980). To be "added" within the meaning of the Act, the addition need not be purposeful. A substance is "added" if any portion of it is present as a result of human acts. *Anderson*, 622 F.2d at 160–161; *United States v. An Article of Food Con-*

1. Pacemaker attempts to characterize the situation as a "battle of the forms" under UCC § 2–207, by calling the phrase an "additional term" which would not become part of the contract unless acceptance was expressly conditioned on it. Pacemaker cites *McCarty v. Verson Allsteel Press Co.*, 89 Ill.App.3d 498, 411 N.E.2d 936, 44 Ill.Dec. 570 (1st Dist.1980), as controlling. *McCarty*, however, was a case where the seller sent the first documents. The court there apparently construed these documents as the offer and the buyer's purchase order as a counter offer. Ordinarily the purchase order is the offer and by definition an offer cannot contain an additional term. We see no indication in the evidence that Swank's purchase order was anything except an offer, which Pacemaker accepted by shipping. There is no "battle of the forms" and § 2–207 does not apply.

*sisting of Cartons of Swordfish,* 395 F.Supp. 1184, 1186 (S.D.N.Y.1975). Since salmonella often enters food as a result of man's failures in processing or sanitation, it is an "added" substance. *Continental Seafoods, Inc. v. Schweiker,* 674 F.2d 38, 42–43 (D.C.Cir.1982). There is no question that the presence of any amount of salmonella, even small amounts, may render a food item injurious to health; food with salmonella is therefore adulterated and not in conformity with the Act. *Continental,* 674 F.2d at 43–44; *United States v. 1,200 Cans Labeled Pasteurized Whole Eggs,* 339 F.Supp. 131, 136 (N.D.Ga.1972). *Cf. Safeway,* 457 F.2d at 964 n. 2.

 The presence of this term in the contract, we think, eliminates any genuine issue that ambiguity was present in the warranty Pacemaker gave. The *Safeway* court found that a contract term requiring that food conform to the Act created an express warranty which was breached by delivery of contaminated cheese, and allowed the defendant/third party plaintiff to recover from the third party defendant on the ground of this warranty as well. 326 F.Supp. at 510–511. There may be a genuine issue of fact as to whether "extra grade" means salmonella-free. There is, however, no ambiguity about what Pacemaker expressly warranted to Swank about the salmonella content of the whey. By ordering whey which conformed to the Food, Drug and Cosmetics Act, Swank unambiguously ordered whey without salmonella. In accepting the contract Pacemaker agreed to provide whey which conformed to the Food, Drug and Cosmetics Act, in other words, whey without salmonella. Whether construed as description or promise, or both, this term comprised an

express warranty which Pacemaker breached when it provided contaminated whey instead. That contamination caused Blommer's damages. Swank is also entitled to partial summary judgment, on liability alone, on count I.

### 4. Implied Warranty of Fitness for a Particular Purpose

Swank also alleges in count III that it relied on an implied warranty by Pacemaker that the whey would be fit for a particular purpose, namely human consumption, and the whey as delivered breached that warranty. Again causation has been decided in ruling on counts I and II, and the sole issue is the difference in warranties.

Pacemaker maintains that it had no knowledge of the particular use to which the whey would be put. It had no direct dealings with Blommer and knew nothing of Blommer's manufacturing processes. It reiterates its argument that the warranty Swank gave Blommer was considerably broader and more comprehensive than any warranty Pacemaker gave Swank.

 UCC § 2–315, however, imposes the implied warranty of fitness for a particular purpose whenever the seller had "reason to know any particular purpose for which the goods are required." Direct communication of specific facts is not necessary if a reasonable seller would derive the purpose from the known circumstances. *See* § 2–315 Comment 1. Swank ordered extra grade whey to be shipped to Blommer Chocolate Company. Pacemaker either knew or should have known that whey sent to be a component in a chocolate product was whey intended for human consumption.[2] Whey with salmonella is not fit

---

2. Pacemaker argues that Blommer's manufacturing processes could conceivably have included a stage of heating the whey to a temperature lethal to salmonella. *Cf. Continental,* 674 F.2d at 41; *1,200 Cans,* 339 F.Supp. at 136 n. 3. Alternatively, Blommer could have had its own program to test incoming products for salmonella. Swank may have known that neither of these things were true, but, says Pacemaker, it failed to pass on the knowledge. The argument, however, misses the point. By it Pacemaker

apparently seeks to recharacterize the § 2–315 warranty into a warranty of fitness for a particular manufacturing process or testing program. According to Comment 2 to § 2–315, the warranty "envisages a specific use by the buyer which is peculiar to the nature of his business." It is not dependent on the exact characteristics of a particular firm's production line unless the parties make it so. In the instant case the specific use is human consumption, which fol-

for human consumption. Pacemaker's whey from Bongards therefore also breached this warranty. Swank is granted partial summary judgment on the liability question on count III as well.

### 5. Swank's Claims For Its Own Damages

■ Swank also alleges in counts VII, VIII and IX of its amended complaint that Pacemaker's breaches of warranty, in addition to making Swank liable to Blommer, caused it further damages. Swank had paid Pacemaker for the whey, but Blommer has, since its discovery of the contamination, refused to pay Swank. Swank says it is therefore damaged to the extent of the cost of the whey, lost profits and shipping costs.

Pacemaker's breaches of its warranties are now the law of the case as a result of our decisions on counts I, II and III. There also seems to be no genuine factual issue as to the reason Blommer rejected the whey. The reason was the presence of salmonella, which resulted from Pacemaker's breaches of warranties. Swank supports its claim for damages on these counts with affidavits and documentation, and Pacemaker does not dispute the amount of the damages. There is therefore no barrier to summary judgment for Swank on counts VII, VIII and IX.

### 6. Indemnity

Swank also moves for summary judgment on count IV, its claim for common law indemnity from Pacemaker. Pacemaker, in opposition to the motion, reiterates the argument both it and Bongards have made before, that indemnity will not lie here because an action for strict liability will not ordinarily lie for purely economic losses. As a question of theory of recovery, this court has twice rejected that position, see Blommer, 635 F.Supp. at 916 and slip op. at 4–5 (N.D.Ill. Apr. 11, 1984), and rejects it again. Swank, in count IV, is not bringing a strict liability action against Pacemaker. Rather, it seeks indemnity from Pacemaker for making it liable to Bloomer. The Illinois Supreme Court in *Maxfield v. Simmons*, 96 Ill.2d 81, 449 N.E.2d 110, 70 Ill.Dec. 236 (1983), expressly recognized that a defendant/third party plaintiff exposed to liability by the tortious conduct of a third party defendant could sue that third party defendant for indemnity regardless of whether the original plaintiff's losses were purely economic or not.

■ An action for indemnity lies in a few narrowly-defined circumstances, among them a relationship between the defendant/third party plaintiff and the third party defendant which (1) existed before the plaintiff's injury and (2) gives rise to a duty to indemnify. *Van Slambrouck v. Economy Baler Co.*, 105 Ill.2d 462, 469, 475 N.E.2d 867, 870, 86 Ill.Dec. 488, 491 (1985). A buyer-seller relationship in which the seller's unreasonably dangerous product puts the buyer at risk of a tort judgment against him is one such relationship. *Maxfield*, 96 Ill.2d at 86, 449 N.E.2d at 112, 70 Ill.Dec. at 238; *Lowe v. Norfolk & Western Railway*, 124 Ill.App.3d 80, 97–98, 463 N.E.2d 792, 805, 79 Ill.Dec. 238, 251 (5th Dist.1984).

The buyer-seller action for indemnity exists where two factors are both present: first, a prior contractual relationship between the parties which reasonably gives rise to an implied contract to indemnify, and second, a factual situation in which the plaintiff's injuries are in no way the fault of the defendant/third party plaintiff who seeks indemnity. *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335, 1341–1342 (7th Cir.1983). *See generally U.S. Home Corp. v. George W. Kennedy Construction Co.*, 617 F.Supp. 893 (N.D.Ill.1985). Swank has adequately alleged such a claim here. It had a contractual relationship with Pacemaker, Pacemaker's product put it at risk, and it strongly maintains that only the defect in that product and not any fault of its own makes it liable to Blommer.

lows from the nature of Blommer's business, namely making chocolate products.

However, there are sound prudential reasons for not granting Swank's motion on this count. Currently, there is an open question in Illinois as to whether common law indemnity survived the passage of the Contribution Among Joint Tortfeasors Act, Ill.Rev.Stat. ch. 70, ¶¶ 301–305. Some courts are confident that it did. *See, e.g., Jethroe v. Koehring Co.,* 603 F.Supp. 1200, 1202–1203 (S.D.Ill.1985). Others are certain that it did not. *Heinrich v. Peabody International Corp.,* 139 Ill.App.3d 289, 486 N.E.2d 1379, 93 Ill.Dec. 544 (1st Dist. 1985); *Holmes v. Sahara Coal Co.,* 131 Ill.App.3d 666, 475 N.E.2d 1383, 86 Ill.Dec. 816 (5th Dist.1985). The Illinois Supreme Court has so far declined to address the issue. *Van Slambrouck,* 105 Ill.2d at 471, 475 N.E.2d at 867, 86 Ill.Dec. at 492. Since the Act applies to all actions accruing after March 1, 1978, Swank's claim fits within the area of uncertainty.

Further, Judge Shadur of this district and one panel of the Illinois Appellate Court have read *Maxfield* as limiting the availability of buyer-seller indemnity to cases in which the defendant/third party plaintiff's liability stems from a tort claim. They hold that there is no indemnity claim when the plaintiff's judgment came on breach of contract or breach of warranty claims. *U.S. Home,* 617 F.Supp. at 897; *Anixter Bros., Inc. v. Central Steel & Wire,* 123 Ill.App.3d 947, 952, 463 N.E.2d 913, 917, 79 Ill.Dec. 359, 363 (1st Dist.1984). According to their interpretation, *Maxfield* recognized that the UCC already provided a comprehensive scheme of remedies for economic loss stemming from commercial transactions, and found those remedies controlling in causes of action based on contract principles. The possibility of indemnity did not, however, conflict with UCC policy to the extent that the defendant/third party plaintiff was exposed to tort liability. *Maxfield's* holding rested on the distinction. *See Maxfield,* 96 Ill.2d at 86–87, 449 N.E.2d at 111–112, 70 Ill.Dec. at 237–238. The defendant/third party plaintiff thus has an indemnity claim only when the plaintiff's claim against him sounds in tort.

*U.S. Home,* 617 F.Supp. at 897; *cf. Fuller,* 719 F.2d at 1341.

Even if indemnity still exists in Illinois, then, Swank may not have a right to it. The only judgments against Swank so far have come on Blommer's warranty claims. Indeed, no tort claims remain outstanding against it. Blommer's original complaint contained counts of negligence and strict liability, but this court dismissed them as against Swank in its April 11, 1984 order. Since Swank has no tort judgment against it, it may have no viable basis at this time for recovery in indemnity from Pacemaker.

As a practical matter, count IV adds nothing to Swank's possibilities of recovery. Swank has today assured itself of shifting all the liability it will have to Blommer over to Pacemaker by means of counts I through III of its complaint, and of recouping all its own damages from Pacemaker through counts VII through IX. There is therefore no need for this court to select sides in the indemnity controversies. Under those circumstances, we decline to do so. Summary judgment on count IV is denied.

## CONCLUSION

This court grants partial summary judgment to third party plaintiff J.M. Swank Company, Inc. on counts I, II and III of its amended complaint against third party defendant Pacemaker, Ltd. on the issue of liability alone, and summary judgment to the same third party plaintiff against the same third party defendant on counts VII, VIII and IX for $15,653.63. Defendant Bongards Creameries, Inc., having accepted the tender of defense from Pacemaker, will be bound by that judgment. Swank's motion for summary judgment is denied as to count IV of both complaints.